ARTNELL COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2780–64. Filed June 23, 1967.

*William A. Cromartie*, for the petitioner.
*William J. Gerard*, for the respondent.

SIMPSON, *Judge:* The respondent has asserted that the petitioner is liable for $563,170.12 as transferee of the assets of Chicago White Sox, Inc. Such liability arises from a determination of deficiency in the transferor's income tax of $303,109.07 for its taxable year November 1, 1961, to May 31, 1962. The respondent also disallowed a net operating loss carryback from such taxable year to the transferor's taxable year January 1, 1959, to October 31, 1959, and, as a result, determined a deficiency of $260,061.05 for that taxable year.

The first issue is whether advance receipts from ticket sales, radio and television revenues, and parking fees were includable in gross income of Chicago White Sox, Inc., for the year of receipt. If so, there remains the question of whether that corporation could deduct or exclude from gross income that part of such receipts which represents Federal admissions tax, City of Chicago amusement tax, and the visiting baseball teams' shares of the receipts.

### FINDINGS OF FACT

All of the facts in this case were fully stipulated at the time of trial, and those facts are so found.

The petitioner, Artnell Co. (Artnell), is a Delaware corporation which had its principal place of business in Chicago, Ill., on the date when the petition in this proceeding was filed. On March 26, 1964, the respondent mailed two notices of transferee liability to the petitioner. One notice was predicated upon the transferor's taxable year January 1, 1959, to October 31, 1959, and asserted a liability of $260,061.05; the other notice was based upon the transferor's taxable year November 1, 1961, to May 31, 1962, and asserted a liability of $303,109.07. The respective periods are hereafter referred to as the taxable years 1959 and 1962.

The petitioner's transferor was Chicago White Sox, Inc. (White Sox), formerly the American League Baseball Club of Chicago, an Illinois corporation. White Sox filed corporate income tax returns for the pertinent periods with the district director of internal revenue at Chicago, Ill.

In May of 1962, the petitioner acquired all of the shares of White Sox from its then shareholders and liquidated White Sox on May 31, 1962. The liquidation of White Sox transferred all of its assets to the petitioner and made the petitioner its transferee. The transferor's final income tax return was for the taxable year 1962.

White Sox used an accrual method of accounting for determining income for both book and income tax purposes. Its taxable year was the calendar year until December 31, 1958, when, with the approval of the respondent, it changed to a taxable year ending on October 31. The taxable year 1959 was the first taxable year ending on such date.

White Sox, for many years prior to May 31, 1962, operated the Chicago White Sox, a baseball team in the American League, playing its home games at Comiskey Park, Chicago. Following the liquidation of White Sox, the petitioner conducted the operations formerly carried on by White Sox.

In determining a deficiency in White Sox's income tax, the adjustments made by the respondent included the addition of $954,024 to its gross income for taxable year 1962. This sum represented gross receipts from advance ticket sales, advance radio and television revenues, and sales of season parking passes. The petitioner has challenged this adjustment in several respects; and in addition, it seeks other adjustments which would result in an increased net operating loss for the taxable year 1962. The increased loss, if allowable, would produce an increased carryback to the taxable year 1959 and result in a refund. White Sox paid $238,599.28 in income tax for the taxable year 1959 and nothing for the taxable year 1962.

During the taxable year 1962, White Sox received the gross amount of $1,192,180.80 representing advance ticket sales. Of this sum, $762,-777 represented gross receipts from 275,514 tickets for baseball games to be played at Comiskey Park during the 1962 baseball season, but after the close of the taxable year 1962. These proceeds were deposited by White Sox in a regular account with a Chicago bank.

During the taxable year 1962, the City of Chicago imposed an amusement tax of 3 percent of gross receipts from admission fees to athletic contests. Of the gross amount of $762,777 received in the advance sale of tickets for baseball games to be played after May 31, 1962, $21,568 represented the 3-percent amusement tax on the admission fees for such games. White Sox paid the Chicago amusement tax

monthly, each payment covering admission fees for games played in the preceding month.

During the taxable year 1962, a Federal admissions tax of 1 cent for each 10 cents or major fraction thereof was imposed on admission charges in excess of $1. Of the gross amount of $762,777 received in the advance sale of tickets for baseball games to be played after May 31, 1962, $43,854 represented the Federal admissions tax on the admission charges for such games. White Sox paid the Federal admissions tax as the games to which the admission charges related were played.

During the taxable year 1962, the constitution of the American League of Professional Baseball Clubs provided in article XIV, section 9, as follows:

The visiting Club shall receive twenty cents (20¢) each on all bleacher or special children admissions and thirty cents (30¢) each on all other paid admissions. A tabulated statement of the visiting Club's share of receipts from all paid admissions at each championship game shall be transmitted to the Treasurer of the League and to the visiting Club by the member of the League at whose park such game has been played, together with the remittance to the League of the League's share of such receipts and remittance to the visiting Club of its share of such receipts, within one business day after the end of the last game of each series of games played during the Championship season.

Of the gross amount of $762,777 received in the advance sale of tickets for games to be played after May 31, 1962, $82,654 represented the visiting clubs' shares of the admission charges for such games. In accordance with the league constitution, White Sox paid the visiting club's share of such admission charges after playing the last game of each series of games to which the charges related.

No part of the gross amount of $762,777 received in the advance sale of tickets for baseball games to be played after May 31, 1962, was taken into income by White Sox for the taxable year 1962. It was carried on the balance sheet of White Sox as of May 31, 1962, as deferred, unearned income. After May 31, 1962, petitioner included such amount in its gross income as it played the games to which the advance ticket sales related.

Each ticket sold by White Sox admitted the holder thereof to a particular game (two games in the case of so-called double headers) to be played on a particular date. In the event of a postponement of that game, the ticket would admit the holder to the postponed game on the date set for its play. In no case was a ticket for a particular game accepted as admission to some other game. However, White Sox consistently followed the practice of granting to the holder of a ticket to any game, whether purchased for an individual game or on a season

basis, a refund of the full ticket price upon surrender of the ticket prior to the play of the game.

During the taxable year 1962, White Sox received $400,000 of radio and television revenue, of which $176,467 was allocable to games to be played after May 31, 1962. No part of such $176,467 was taken into income by White Sox for the taxable year 1962. It was carried on the balance sheet of White Sox as of May 31, 1962, as deferred, unearned income. After May 31, 1962, petitioner took such amount into its gross income as it played the games to which the amount related.

White Sox sold 389 season parking books for the 1962 baseball season for an aggregate amount of $21,395. Of this amount, $14,780 is allocable to home playing dates after May 31, 1962. No part of this $14,780 was taken into income by White Sox for the taxable year 1962. It was carried on the balance sheet of White Sox as of May 31, 1962, as deferred, unearned income. After May 31, 1962, petitioner took such amount into its gross income as the home playing dates to which it related occurred.

### OPINION

This case presents us with another of the many controversies concerning the proper tax accounting for prepaid income. Three times in recent years the issue has been considered by the Supreme Court (*Schlude* v. *Commissioner*, 372 U.S. 128 (1963); *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961); *Automobile Club* v. *Commissioner*, 353 U.S. 180 (1957)); and on several recent occasions, it has been passed on by this Court (*Hagen Advertising Displays, Inc.*, 47 T.C. 139 (1966); *Decision, Inc.*, 47 T.C. 58 (1966); *Chester Farrara*, 44 T.C. 189 (1965)). In all these cases, it has been held that the respondent could apply section 446(b) of the Internal Revenue Code of 1954 [1] and require prepaid income to be taxed when received. Nevertheless, this petitioner argues vigorously that those decisions do not govern this case and that in this case the taxation of the income should be deferred until it is earned.

Before we reach that substantive issue, however, the petitioner confronts us with a procedural problem. He argues that since the respondent's deficiency notice purported to find the advance receipts taxable under section 61, the respondent may not argue the applicability of section 446(b), as he now proposes to do in his brief. The petitioner believes that our opinion in *Burrell Groves, Inc.*, 16 T.C. 1163 (1951), supports his position.

We are not convinced by the petitioner's argument. The question is was the petitioner given adequate notice of the respondent's conten-

---

[1] All statutory references are to the Internal Revenue Code of 1954.

tion that the prepaid income was taxable upon receipt. In *Hagen Advertising Displays, Inc., supra,* the notice of deficiency also referred merely to section 61, but this Court considered that the question of the applicability of section 446(b) was properly raised. Taking into consideration all the circumstances of this case, we think that the petitioner had adequate notice of the issue of when the advance receipts should be reported for purposes of tax accounting. Cf. *Nat Harrison Associates, Inc.,* 42 T.C. 601, 617 (1964); *Hilbert L. Bair,* 16 T.C. 90 (1951), affd. 199 F. 2d 589 (C.A. 2, 1952). Furthermore, *Burrell Groves, Inc.,* involved the predecessor of section 482 and a deficiency notice which neither referred to that section, nor made the allocations permitted by such section. This case involves section 446(b) and a deficiency notice which computes taxable income in a manner permitted by that section. This case is, therefore, distinguishable from *Burrell Groves, Inc.,* but not from *Hagen Advertising Displays, Inc.,* and we must consider the applicability of section 446(b).

In connection with the principal substantive issue of the case, the petitioner presents the question as one of to whom income is taxable and argues that it must be taxed to the person who earns it. He also argues that this case is distinguishable from the prepaid income decisions by the Supreme Court because in all of them the Court found that the method of accounting used by the taxpayer did not accurately reflect income. He says that the courts have never required prepaid income to be taxed upon receipt when the taxpayer was using an accurate method for deferring the income. Finally, the petitioner argues that if we should decide the principal issue against his position, some of the advance receipts were not received under a claim of right and are not, therefore, includable in income upon receipt.

The respondent's position is simply that all advance income is reportable and taxable at the time of receipt, without diminution for what he regards as the estimated expenses of earning such income.

Since the respondent does not contend that the petitioner's method for deferring the advance receipts fails to match properly income and related expenses, we must therefore decide whether prepaid income is taxable in the year received, regardless of the merits of the proposed method for deferring it. We must also decide whether the tax treatment of prepaid income is different when the person who receives it is not the person who performs the services which earn the income.

We hold that the respondent acted properly under section 446(b) when he required the White Sox to include the advance receipts in gross income for the year in which they were received.

In the Supreme Court decisions, the Court set forth alternative bases for its decisions. In each case it found that the method of accounting

used by the taxpayer was deficient, but in the later cases it also held that in view of the legislative history concerning tax accounting for prepaid income, such income is taxable upon receipt except when Congress expressly provides for its deferment. Notwithstanding the Court's criticism of the methods of accounting used by the taxpayers in those cases, we believe that the Court would reach the same result without regard to the method used by the taxpayer for deferring prepaid income. In *American Automobile Assn.* v. *United States, supra,* the Supreme Court upheld the respondent's exercise of discretion under section 446(b), despite expert testimony tending to show that the taxpayer's deferral of income comported with sound accounting principles. In *Automobile Club* v. *Commissioner, supra,* the Supreme Court upheld the respondent's determination that a deferral of income actually received did not clearly reflect income, despite the fact that the taxpayer had used such a system of accounting for several years. It is clear to us that the use of the same accounting method for many years, or the fact that such a method is otherwise sound accounting, is not a reason to hold that the respondent abused his discretion in finding that such a method did not clearly reflect income for tax purposes.

Although the petitioner discusses at some length the legislative history of the treatment of prepaid income, we think that the Supreme Court in the *American Automobile Assn.* decision disposed of his contentions. After reviewing the legislative history, the Court said:

It appears that in this action Congress first overruled the long administrative practice of the Commissioner and holding of the courts in disallowing such deferral of income for tax purposes and then within a year reversed its own action. This repeal, we believe, confirms our view that the method used by the Association could be rejected by the Commissioner. While the claim is made that Congress did not "intend to disturb prior law as it affected permissible accrual accounting provisions for tax purposes," H.R. Rep. No. 293 84th Cong., 1st Sess. 4–5, the cold fact is that it repealed the only law incontestably permitting the practice upon which the Association depends. To say that, as to taxpayers using such systems, Congress was merely declaring existing law when it adopted § 452 in 1954, and that it was merely restoring unaffected the same prior law when it repealed the new section in 1955 for good reason, is a contradiction in itself, "varnishing nonsense with the charm of sound." Instead of constituting a merely duplicative creation, the fact is that § 452 for the first time specifically declared petitioner's system of accounting to be acceptable for income tax purposes, and overruled the long-standing position of the Commissioner and courts to the contrary. And the repeal of the section the following year, upon insistence by the Treasury that the proposed endorsement of such tax accounting would have a disastrous impact on the Government's revenue, was just as clearly a mandate from the Congress that petitioner's system was not acceptable for tax purposes. * * * [367 U.S. at 695.]

In its conclusion, the Court also said: "We must leave to the Congress the fashioning of a rule which, in any event, must have wide ramifications. * * * [367 U.S. at 697.]"

This is strong language, and we think that it indicates that the Supreme Court would reach the same decision regardless of the method used by the taxpayer for deferring prepaid income.

In the *Hagen Advertising* case, recently decided by this Court, the taxpayer was using a method which accurately matched prepaid income with the cost of goods sold. Nonetheless, this Court held that the prepaid income was reportable when received. We think that this decision clearly establishes the position of this Court and rejects the position urged by the petitioner.

Moreover, we are not persuaded by the petitioner's argument that to tax the prepaid income on receipt taxes it to the wrong person. In all the prepaid income cases, the services which earned the income were to be performed in the future; yet that fact did not justify postponing the taxation of the income. If White Sox had continued to operate the baseball team but had ended its taxable year on May 31, 1962, the advance receipts would have been reportable in such taxable year. We cannot see how the liquidation alters that result. The income is still taxable when received. The line of cases cited by the petitioner involved an essentially different problem. *Williamson* v. *United States*, 292 F. 2d 524 (Ct. Cl. 1961); *J. Ungar, Inc.*, 26 T.C. 331 (1956), affd. 244 F. 2d 90 (C.A. 2, 1957); *Susan J. Carter*, 9 T.C. 364 (1947), affd. 170 F. 2d 911 (C.A. 2, 1948); *Jud Plumbing & Heating, Inc.*, 5 T.C. 127 (1945), affd. 153 F. 2d 681 (C.A. 5, 1946). In them the services were performed in advance of the receipt of the income, and in them the Court found that the parties were attempting to shift the tax burden to a person who had not earned the income. The Court struck down the attempted shifting of the tax burden. The prepaid income cases present an entirely different problem—that is, should receipts be taxed when they are in hand, or should their taxation be deferred until they are earned; and we see no sufficient reason for departing from the general rule that such income is taxable when received.

The petitioner's alternative argument is that those portions of advance receipts which represent Federal admissions tax, City of Chicago amusement tax, and the visiting clubs' shares of ticket sales were not income or were deductible expenses during the taxable year 1962.

Not all receipts of money or property are a part of the taxpayer's gross income and subject to the rule of the prepaid income cases. *Hagen Advertising Displays, Inc.*, *supra* at 12. The receipt of a bona fide loan and the collection of funds as an agent or trustee of another are examples of receipts which are not taxable to the person who merely receives the funds. *Willard S. Heminway*, 44 T.C. 96 (1965); *James M. Hutchinson, et al.*, 11 B.T.A. 789 (1928).

The collection of Federal admissions tax is a collection of funds on behalf of the U.S. Government, and such funds are not a part of the

collector's gross income. This tax was imposed on the amount paid for admission to the games, and section 4231 required the person paying for such admission to also pay the tax. Section 4291 required White Sox to collect the tax, and section 7501 (a) provides as follows:

SEC. 7501. LIABILITY FOR TAXES WITHHELD OR COLLECTED.

(a) GENERAL RULE.—Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States. * * *

The language making such collections a special fund was enacted as part of the Revenue Act of 1934, and the legislative history of that act discloses a clear intent to make the collector of the admissions tax a trustee, rather than a mere debtor.[2] Accordingly, no part of the $43,854 collected as Federal admissions tax is includable in White Sox's gross income for the taxable year 1962.

On the other hand, no part of the $21,568 representing a license tax imposed by the City of Chicago is excludable or deductible from White Sox's gross income for the taxable year 1962. The applicable city ordinances provide that the tax is a license tax upon amusements within the city and is to be paid by the 10th day of the calendar month for all gross receipts during the preceding calendar month. An examination of sections 104–1 through 104–3 of the Municipal Code of the City of Chicago leads us to the conclusion that White Sox was liable for the tax; and no provision which would make White Sox the agent or trustee of the city has been brought to our attention. Accordingly, there is no reason to exclude such receipts from gross income. In addition, the $21,568 in question represented the tax on admissions which had not yet occurred, and the proceeds of which might be refunded. At the close of the taxable year 1962, there was no way to ascertain the paid attendance for the succeeding months or the amount of the liability to the City of Chicago for those months. All of the events which determined liability for the tax had not occurred by the end of White Sox's taxable year 1962, and, therefore, no accrual of a deduction was allowable. United States v. Anderson, 269 U.S. 422 (1926); sec. 1.461–1(a) (2), Income Tax Regs.

We also find that no part of the $82,654 representing the visiting teams' shares of advance ticket sales is deductible or excludable from

---

[2] "Existing law provides with respect to a number of taxes that the amount of the tax shall be collected or withheld from the person primarily liable by another person, who is required to return and pay to the Government the amount of the taxes so collected or withheld by him. This is true, for example, in the case of the taxes on admissions, checks, and telephone and telegraph services. Under existing law the liability of the person collecting and withholding the taxes to pay over the amount is merely a debt, and he cannot be treated as a trustee or proceeded against by distraint. Section 606 of the bill as reported impresses the amount of taxes withheld or collected with a trust and makes applicable for the enforcement of the Government's claim the administrative provisions for assessment and collection of taxes." S. Rept. No. 558, 73d Cong., 2d Sess., p. 53 (1934).

White Sox's gross income for the taxable year 1962. The amounts received for the tickets were paid to the White Sox for playing the games. Those amounts were income of the White Sox; and they were not held as an agent or trustee for the visiting teams. The liability to the visiting teams does not alter White Sox's claim to the income. *Compton Bennett*, 23 T.C. 1073 (1955). Thus, there is no reason to exclude the visiting teams' shares from the income of the White Sox for the taxable year 1962. The provision of the constitution of the American League of Professional Baseball Clubs, providing for payment to the visiting team, expressly states that payment is to be made *after* the games are played. The sum in question here relates to games which had not been played in the taxable year 1962, and there was no certainty that each game on the schedule would be played, nor was the amount that would be due to the visiting club known or ascertainable in May of 1962. Therefore, no deduction was properly accruable. *United States* v. *Anderson, supra;* sec. 1.461–1(a) (2), Income Tax Regs.

All remaining issues have been abandoned by the petitioner or conceded by the respondent.

In order to reflect our resolution of the issues and the concessions of the parties,

*Decision will be entered under Rule 50.*